# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER M. TRULY, | ) | CASE NO. 1:17CV00862 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jennifer Truly, ("Plaintiff" or "Truly"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

## I.   PROCEDURAL HISTORY

In August 2013, Truly filed an application for POD, DIB, and SSI, alleging a disability onset date of July 31, 2013 and claiming she was disabled due to primary sclerosing cholangitis, liver disease, Grave's disease, ulcerative colitis, an autoimmune hepatitis, the need for a liver transplant, a thyroid disease, spinal scoliosis, and anxiety.  (Transcript ("Tr.") 230, 237, 265.)  The applications were denied initially and upon reconsideration, and Truly requested a hearing before an administrative law judge ("ALJ").  (Tr. 132, 136, 142, 149, 154.)

On June 7, 2016, an ALJ held a hearing, during which Truly, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 42-63.)  During the hearing, Truly, through counsel, requested a closed period of disability from July 31, 2013 through August 5, 2015.  (Tr. 49.)  On July 1, 2016, the ALJ issued a written decision finding Truly was not disabled.  (Tr. 19-34.)  The ALJ's decision became final on February 16, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On April 21, 2017, Truly filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12 & 13.)  Truly  asserts the following assignment of error:

(1)     The ALJ erred at step five of the sequential evaluation in finding the plaintiff not disabled.

(Doc. No. 12.)

## II.   EVIDENCE

**A.      Personal and Vocational Evidence**

Truly was born in April 1984 and was 32 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 32.)  *See* 20

2

C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a server and bartender.  (*Id.*)

**B.     Medical Evidence[2]**

From July 31 through August 3, 2013, Truly was hospitalized for abdominal pain, nausea, and jaundice.  (Tr. 399.)  During her hospitalization, she had an abnormal cholangiogram and elevated liver function testing.  (Tr. 400, 402.)  She underwent a laparoscopic cholecystectomy (i.e., gallbladder removal).  (Tr. 402.)  During this procedure, the surgeon voiced concerns Truly possibly had portosystemic encephalopathy ("PSE").  (Tr. 444.)  Truly was then transferred to another hospital for further work up.  (*Id.*)

Truly remained hospitalized from August 3 through 6, 2013.  (*Id.*)  During this second hospitalization, Truly underwent a "slew of tests," including an ultrasound-guided liver biopsy.  (Tr. 445.)  The liver biopsy revealed findings consistent with autoimmune hepatitis and primary sclerosing cholangitis ("PSC") with overlap syndrome.  (Tr. 447.)  She underwent an endoscopic retrograde cholangiopancreatography ("ERCP") and stent placement in her liver.  (Tr. 445.)  Pierre Gholam, M.D., a gastroenterologist and hepatic specialist, diagnosed Truly with PSC with possible overlap syndrome.  (Tr. 444.)

On August 26, 2013, Truly underwent a colonoscopy and a repeat ERCP.  (Tr. 510, 511.)  During her ERCP, her liver stent was removed, and the procedure revealed improvement in her liver ducts.  (Tr. 512.)  Her colonoscopy yielded normal findings.  (Tr. 510.)

Truly followed up with Dr. Gholam on November 12, 2013, indicating she was feeling

---

[2]          The Court notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

"quite a bit better than when she was first diagnosed." (Tr. 521.)  Her liver enzymes were trending "clearly towards normalization." (*Id*.)  Truly reported constipation and intermittent abdominal pain. (*Id*.)  On February 4, 2014, an ultrasound of Truly's right upper abdominal quadrant revealed no significant intra- or extra-hepatic biliary dilatation. (Tr. 527.)

On February 11, 2014, Dr. Gholam indicated Truly's "liver enzymes initially normalized" on her medications, but she subsequently developed abdominal pain and possibly pancreatitis from one of her medications. (Tr. 528.)  However, he reported since he adjusted her medications, by prescribing CellCept and Prednisone, she was "back in biochemical remission." (*Id*.)  Truly reported generalized joint pains and difficulty walking. (*Id*.)  On examination, Truly had tenderness along her lower back and hip joints. (*Id*.)  Dr. Gholam referred Truly to a rheumatologist for evaluation. (Tr. 529.)

On March 25, 2014, Dr. Gholam filled out a "Chronic Liver Disease Treating Physician Data Sheet," prepared by Truly's attorney. (Tr. 614.)  On the sheet, Dr. Gholam provided the following information:

- Truly has chronic liver disease, with overlap syndrome, PSC, and autoimmune hepatitis;

- She has portal hypertension, which has not required shunt surgery;

- She is on the following medications: CellCept, Cyproheptadine, Omeprazole, Prednisone, and Ursodiol;

- Her last measured bilirubin, INR, and albumin were normal;

- Her last measured hepatic enzymes were not normal;

- She does not have ascites attributable to liver disease; and

- She does not have end-stage liver disease.

4

(Tr. 615-620.)

On May 7, 2014, Truly presented to the emergency room with abdominal pain.  (Tr. 738.)
A CT scan was suggestive for bowel inflammation and an ovarian cyst rupture.  (*Id*.)  She was
hospitalized for a gastroenterology consultation and evaluation.  (*Id*.)  A colonoscopy revealed an
ulcer at the hepatic flexure, but the remainder of her colon and terminal ileum were normal.  (Tr.
754.)

Truly returned to Dr. Gholam on July 1, 2014, and reported continued joint and
abdominal pain.  (Tr. 713.)  On examination, she had diffuse, direct abdominal pain, with normal
bowel sounds.  (Tr. 717.)  Her gait and station were normal, and she had no edema in her
extremities.  (*Id*.)  Dr. Gholam determined Truly was in "biochemical remission," and renewed
her medications.  (Tr. 719.)

On July 24, 2014, a CT scan of Truly's abdomen was negative for hydronephrosis.  (Tr.
790.)  However, the CT scan revealed "rounding of the left hepatic lobe and very subtle
micronodularity of the liver contour and prominence of the spleen, which suspects underlying
chronic liver disease such as cirrhosis."  (*Id*.)  An August 12, 2014 ultrasound of Truly's liver
and abdomen indicated "coarsening of the hepatic echotexture, without focal lesion or
perihepatic fluid" and an "unremarkable appearance of the visualized portions of the pancreas
and right kidney."  (Tr. 707.)

Truly returned to Dr. Gholam on October 7, 2014, reporting flank pain, abdominal pain,
bloating, loose black stool, and intermittent fever.  (Tr. 702.)  On examination, she had diffuse
right upper quadrant abdominal pain, normal bowel sounds, and normal gait and station.  (Tr.
706.)  Dr. Gholam listed her PSC and autoimmune hepatitis as "in remission."  (Tr. 711.)

5

On December 4, 2014, Truly advised Dr. Gholam she was in her first trimester of pregnancy, and was feeling "poorly in general." (Tr. 685.) Dr. Gholam noted her "numbers have finally begun to trend towards normalization" with daily Prednisone. (*Id.*) On examination, she had diffuse abdominal tenderness, with a normal gait and station. (Tr. 688.) Dr. Gholam indicated she was "trending towards biochemical remission," and encouraged her to undergo monthly liver function testing and see a high risk obstetrician. (Tr. 690.)

On December 13, 2014, Truly presented to the emergency room for abdominal pain. (Tr. 817.) An MRI of her abdomen revealed no abnormal fluid collections and an unremarkable spleen. (Tr. 820.) She was prescribed her Miralax for constipation. (*Id.*)

On February 17, 2015, Truly reported to Dr. Gholam she still felt "poorly," with both abdominal and joint pain. (Tr. 679.) Upon examination, Truly had no extremity edema, was not in distress, and had a normal gait and station. (Tr. 682.) Dr. Gholam noted while Truly was in complete biochemical remission due to high dosages of Prednisone, this was "at the cost of massive weight gain and multiple side effects." (Tr. 683.) However, Dr. Gholam indicated this was "the only viable option for now until after she completes the pregnancy." (*Id.*)

On March 20, 2015, Truly consulted with psychiatrist Jaina Amin, M.D. (Tr. 622.) She reported she was 29 weeks pregnant, and had been off her CellCept and Abilify since the beginning of her pregnancy. (*Id.*) She indicated worsening depression, and reported the last two years of her life had been "very stressful and depressing." (Tr. 623, 622.) She described suicidal thoughts, fear of the future, constant worry, and excessive counting behaviors. (Tr. 623.) During the evaluation, her eye contact, attention, and concentration were all normal. (Tr. 625.) Dr. Amin diagnosed anxiety with obsessional features and moderate, recurrent, major depression.

6

(*Id*.)  She prescribed Seroquel.  (Tr. 626.)

On May 5, 2015, Dr. Gholam noted Truly continued to be in biochemical remission, but it had "come with the price of gestational diabetes."  (Tr. 671.)  Truly reported fatigue and swelling.  (*Id*.)  On examination, her abdomen was normal, and she had no edema in her extremities.  (Tr. 675.)  Dr. Gholam advised Truly she would need to remain on Prednisone for two months after the delivery of her child.  (Tr. 678.)

Truly followed up with Dr. Amin on May 15, 2015.  (Tr. 629.)  She reported her Seroquel dosage was too strong, and she was sleeping poorly at night and tired during the day.  (*Id*.)  She denied suicidal ideation, but continued to worry about the future and her health.  (*Id*.)  Dr. Amin adjusted her Seroquel dosage.  (Tr. 632.)

On July 21, 2015, Truly reported to Dr. Gholam she had recently been hospitalized for abdominal pain, and her medications were switched back to CellCept and Prednisone.  (Tr. 662.) Dr. Gholam noted a recent MRI suggested "diffuse progression of stricturing disease."  (*Id*.)  On examination, her abdomen, gait, and station were all normal.  (Tr. 666.)  Dr. Gholam began to taper Truly's Prednisone dosage.  (Tr. 670.)

On September 10, 2015, Truly visited the emergency room, reporting nausea, vomiting, diarrhea, and abdominal pain.  (Tr. 808.)  A CT of her abdomen revealed "no acute changes," her "workup was fairly unremarkable," and her abdominal examination was "fairly benign."  (Tr. 809, 811.)

Truly saw Dr. Gholam on November 10, 2015, reporting left-sided pain with loose bowels.  (Tr. 652.)  On examination, she had left-sided abdominal pain, with normal bowel sounds.  (Tr. 655.)  Her gait and station were normal, and she had no extremity edema.  (*Id*.)

7

A November 17, 2015 ultrasound of her liver revealed the following: (1) a heterogeneous appearance of the liver with mild left-sided intrahepatic biliary dilatation, consistent with Truly's history of autoimmune hepatitis/PSC and (2) a hypoechoic structure in the left hepatic lobe, most likely a cyst.  (Tr. 640.)[3]

On February 4, 2016, Dr. Gholam noted Truly was in "biochemical remission" on CellCept and Prednisone, and was continuing "to feel better and lose weight as we taper Prednisone."  (Tr. 642.)  Truly reported chronic musculoskeletal pain and occasional right upper quadrant abdominal pain.  (*Id*.)  On examination, her abdomen, gait, and station were normal.  (Tr. 645.)  She had no extremity edema.  (*Id*.)  Dr. Gholam indicated Truly was "doing well."  (Tr.  650.)[4]

---

[3]     The Court notes Truly references a January 16, 2016 lumbar MRI in her brief. (Doc. No. 12 at 6.)  However, an examination of this MRI indicates it is not Truly's MRI, but that of another individual, unrelated to this claim.  (Tr. 874.)

[4]     In her brief, Truly cites to additional evidence which was not before the ALJ for review, but was submitted to the Appeals Council after the ALJ decision.  This evidence includes a February 2016 emergency room visit, a June 2016 hospitalization, a July 2016 hospitalization, and an August 2016 office visit with Dr. Gholam.  (Tr. 801-803, 836-847, 852, 860-863.)  The Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the district court's review is limited to the record available to the ALJ.  *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan. 22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).  As such, the Court will not include these medical records in its recitation of the medical evidence.

## C.      State Agency Reports

### 1.      Mental Impairments

On September 21, 2013, Truly underwent a consultative examination with Charles F. Misja, Ph.D. (Tr. 482–488.) She described panic attacks, depression, and poor sleep. (Tr. 483, 486.) She denied any psychiatric hospitalizations, but reported she recently saw a psychiatrist for anxiety. (Tr. 484.) During the interview, Truly's affect was blunted and her mood depressed. (Tr. 485.) Dr. Misja estimated her intelligence to be in the average range. (Tr. 486.)

Based upon this examination, Dr. Misja diagnosed Truly with Mood Disorder Due to PSC and Generalized Anxiety Disorder. (*Id.*) He assigned her a Global Assessment of Functioning ("GAF") score of 55,[5] indicating moderate symptoms. (Tr. 487.) Dr. Misja noted Truly was "reeling from the implications of her recent diagnosis including the ultimate requirement of a liver transplant and her doctors telling her she may not have children." (*Id.*) He then provided the following opinion regarding Truly:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**
> The claimant is a high school graduate and has attended college. She is probably functioning in the average range of intelligence and should have no problems understanding and implementing ordinary instructions.
>
> **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform**

---

[5]      The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

9

**simple tasks and to perform multi-step tasks.**
The claimant reported no history of problems with learning or attention and none were demonstrated during the brief intellectual screening and interview. Problems in this area are likely to be in the minimal range.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
The claimant has no legal history and does not appear to have a personality disorder.  She stated she's never been fired from a job and has always gotten along very well with supervisors and coworkers.  However, at the time of this assessment she is overwhelmed with the implications of her recent diagnosis and has retreated to the safety of her home and has isolated herself socially. Problems in this area are likely to be in the intermediate to severe range for the foreseeable future; however, her premorbid level of functioning appears to have been good and bodes well for some degree of recovery.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
The longest she's ever had a job is only about a year and a half and she's drifted in and out of jobs as a server and bar tender and has never had a career-type job.  She reported no incidents of problems involving attendance or performance.  Her current psychological state will substantially lower her ability to cope with stress in the workplace environment and problems in this area are likely to be in the intermediate range.

(Tr. 487-488.)

On October 2, 2013, state agency physician Patricia Semmelman, Ph.D., reviewed Truly's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 73-74, 77-78.)  She concluded Truly had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 73.)  With regard to Truly's mental functional limitations, Dr Semmelman found Truly was moderately limited in her abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2)

10

interact appropriately with the general public; and (3) respond appropriately to changes in the work setting.  (Tr. 77-78.)  She found Truly was not significantly limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work-related decisions; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) be aware of normal hazards and take appropriate precautions; (12) travel in unfamiliar places or use public transportation; and (13) set realistic goals or make plans independently of others.  (*Id.*)  Dr. Semmelman found no evidence of any limitation in her ability to carry out very short and simple instructions.  (Tr. 77.)  Dr. Semmelman explained the basis of her decision as follows:

> Claimant is capable of simple and multi-step work tasks in a fairly predictable work environment without demands for a fast pace of work.
>
> ***
> Claimant is capable of brief, superficial interactions with customers, coworkers, and supervisors.  She reported [she] got along fine on the job. She reported to the CE that she has panic attacks and [is] easily overwhelmed but [medical evidence of record] in file shows some anxiety which ebbs and flows at times due to whether she is taking the [psychotropic medications] or not per [May 2012 treatment note].
>
> ***
> Claimant can adjust to occasional, routine change in the work environment.

(Tr. 77-78.)

11

On April 18, 2014, state agency physician Vicki Warren, Ph.D., reviewed Truly's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 105-106; 109-111.)  She concluded Truly had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 105.)  With regard to Truly's mental functional limitations, Dr. Warren affirmed Dr. Semmelman's assessments.  (Tr. 109-111.)

    **2.**     **Physical Impairments**

On January 21, 2014, state agency physician Eli Perencevich, D.O., reviewed Truly's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 75-77.)  Dr. Perencevich determined Truly could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 75.)  He further found Truly was limited to frequently climbing ramps and stairs, never climbing ladders, ropes, and scaffolds, frequently balancing, stooping, and kneeling, and occasionally crouching and crawling.  (Tr. 76.)  Dr. Perencevich concluded Truly should avoid unprotected heights and concentrated exposure to vibrations.  (Tr. 76, 77.)

On April 22, 2014, state agency physician Anton Freihofner, M.D. reviewed Truly's medical records and completed a Physical RFC Assessment.  (Tr. 107-109.)  He adopted Dr. Perencevich's assessment.  (*Id.*)

**D.**     **Hearing Testimony**

During the June 7, 2016 hearing, Truly testified to the following:

- She graduated high school and attended two years of college.  (Tr. 46.)  She previously worked as a server and a bartender.  (*Id*.)  She was unable to work from July 2013 through August 2015.  (Tr. 48.)  She returned to work in August 2015, working as a banquet server captain.  (*Id*.)  She earns about $1,500 a month and works 20-25 hours a week.  (Tr. 48, 52.)  She does not think she is capable of working full time.  (Tr. 52-53.)

- She stopped working because she developed severe pain in her side and back.  (Tr. 49.)  She had her gallbladder removed and was diagnosed with autoimmune hepatitis with PSC.  (*Id*.)  She must take Prednisone for "the rest of my life until a transplant."  (Tr. 50.)

- Her symptoms include "pucking[sic] bile, severe pain in my sides, bad joint pain, back pain, liver pain, confusion, fatigue, [and] severe itching."  (Tr. 50.)  She can stand or walk for about two hours, and will then need to sit down and take a break.  (Tr. 51.)  She is tired "all the time," which prevents her "from doing a lot of things."  (*Id*.)  She stated she was sleeping 12-15 hours a day prior to August 2015.  (Tr. 52.)

- She needs a liver transplant in the future, but it has not yet been scheduled.  (Tr. 53.)  She "got kicked off" the transplant list, as her medications stabilized her condition.  (*Id*.)  Her MELD score is 17, and in order to qualify for a transplant, she will need a score of 26-28.  (Tr. 54.)

The VE testified Kinsley had past work as a server (D.O.T. #311.477-030) and a bartender (D.O.T. #312.474-010).  (Tr. 58.)  The ALJ then posed the following hypothetical question:

This individual is limited to work of light[6] exertional requirements, with

---

[6]    "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

13

additional limitations.  Specifically no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  No exposure to vibration or hazards, specifically heights, machinery, commercial driving.  And mental limitation, that she perform routine tasks in a low stress environment, specifically no fast pace or strict quotas or frequent duty changes involving superficial interpersonal interactions, specifically no arbitration, negotiation, no confrontation.

(Tr. 58-59.)

The VE testified the hypothetical individual would not be able to perform Truly's past work as a bartender and server.  (Tr. 59.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as document addressor (sedentary, unskilled), inspector (sedentary, unskilled), photocopy machine operator (light, unskilled), and inspector, hand packager (light, unskilled).  (Tr. 59-60.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

14

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Truly was insured on her alleged disability onset date, July 31, 2013, and remained insured through March 31, 2016, her date last insured ("DLI.")  (Tr. 21.)  Therefore, in order to be entitled to POD and DIB, Truly must establish a continuous twelve month period of disability

commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2.     The claimant did not engage in substantial gainful activity from July 31, 2013 through August 5, 201[5], the last day of the requested closed period (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: chronic hepatitis with fibrosis, hypothyroidism, status post thyroidectomy for Grave's disease, mood disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that, during the requested closed period, the claimant had the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to vibration or hazards (heights, machinery, or commercial driving); and mental limitation that she perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation or confrontation) (20 CFR 404.1569a and 416.969a).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on April **, 1984 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date

(20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant was not been under a disability, as defined in the Social Security Act, at any time during the requested closed period from July 31, 2013 to August 5, 2015 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-33.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

17

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

18

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.        First Assignment of Error: Credibility Assessment

In her sole assignment of error, Truly argues the ALJ "failed to appropriately address [her] symptoms and allegations concerning her debilitating symptoms in assessing her credibility." (Doc. No. 12 at 9.) She maintains the objective evidence of her liver disease "supports the debilitating nature of the symptoms that she describes." (*Id*. at 11.) Specifically, Truly asserts the ALJ's credibility assessment is unsupported by substantial evidence as her condition is unresponsive to treatment and progressed during the relevant period. (*Id*.) She further argues the ALJ's reliance on a normal gait in the medical record has "little to do with" the severity of her liver condition. (*Id*. at 12.) Finally, Truly contends the ALJ's evaluation of her activities of daily living is "disingenuous, and fails to comply with the controlling standards, which provide that the ability to perform said activities does not support adverse credibility findings." (*Id*.)

The Commissioner maintains "substantial evidence supports the ALJ's determination that Plaintiff's statements about the severity and intensity of her symptoms were only partially

19

credible." (Doc. No. 13 at 7.) She asserts the ALJ provided multiple reasons for his credibility determination, including Truly's (1) normal gait on physical examination, (2) improvement with treatment, and (3) activities of daily living. (*Id*. at 8, 9, 12.) The Commissioner argues while Truly may require a liver transplant in the future, this does not compel the ALJ to "credit her allegations of total disability." (*Id*. at 10.) The Commissioner reasons Truly's "ability to work since August 2015 contradicts her claim that being on the transplant list eleven months later was proof of her total disability." (*Id*. at 10, 11.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec.*, 409 Fed. App'x 917, 921 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[7] Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a

---

[7]    The Commissioner erroneously asserts in her brief "the substantive aspects of SSR 16-3p do not apply retroactively, so SSR 96-7p still governs this case." (Doc. No. 13 at 2.) However, SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the June 7, 2016 hearing.

finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.,* 137 Fed. App'x 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[8] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the

---

[8]    SSR 16-3p has removed the term "credibility" from its analysis.  Rather SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with the objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' "  *Dooley v. Comm'r of Soc. Sec*., 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).  Regardless, neither party has argued the analysis under SSR 16-3p over SSR 96-7p would change the outcome.

individual's symptoms."   SSR 16-3p, 2016 WL 1119029 at *9 (Mar. 16, 2016); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029  (Mar. 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[9]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Truly's testimony and written statements regarding her liver disease, abdominal pain, and joint pain.  (Tr. 26.)  He noted she testified that, during the requested closed period, she could walk for two hours and would sleep for 12-15 hours a day.  (*Id*.)  The ALJ determined Truly's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found her statements concerning the

---

[9]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec*., 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with

the medical evidence and other evidence in the record." (*Id*.) Specifically, the ALJ further

provided:

> However, in assessing the claimant's medically determinable impairments and their impact on her ability to perform work functions, the undersigned also considered the claimant's subjective allegations giving careful consideration to all avenues presented that relate to such matters as:
>
> 1. The claimant's daily activities;
> 2. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
> 3. Precipitating and aggravating factors (e.g. movement, activity, environmental conditions);
> 4. The type, dosage, effectiveness, and adverse side-effects of any pain medications;
> 5. Treatment, other than medication, the claimant has received for relief of pain;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.
>
> (20 CFR 404.1529 and SSR 16-3p). Consideration was also given to all the evidence related to the claimant's prior work history, and the observations of non-medical third parties, as well as treating and examining physicians related to the above matters. However, for the reasons given below, the undersigned finds that the claimant's alleged functional deficits are inconsistent with the medical evidence and other evidence in the record.

(Tr. 27.) The ALJ then provided a 5-page discussion of Truly's treatment records, the objective

findings on examination, the effectiveness of her treatment, her activities of daily living, and the

medical opinion evidence. (Tr. 27-31.)

Substantial evidence supports the ALJ's credibility determination. Updated MRIs and

CT scans have confirmed liver disease and PSC, with some progression of the disease. (Tr. 790,

702, 662.) However, as the ALJ correctly noted, much the diagnostic testing has indicated stable

23

and mild findings.  (Tr. 28.)  Specifically, an August 2013 colonoscopy was normal, an August 2013 ERCP procedure indicated improvement of the liver ducts, a February 2014 abdominal ultrasound indicated no significant hepatic biliary dilatation, and a September 2015 CT scan indicated stable intrahepatic duct dilatation.  (Tr. 510, 511, 527, 650.)  A November 2015 liver ultrasound indicated mild left-sided intrahepatic biliary dilatation.  (Tr. 640.)

Morever, Dr. Gholam's treatment notes indicate Truly's medication regimen was effective.  In February 2014, Dr. Gholam noted Truly's liver enzymes had normalized.  (Tr. 528.) In July 2014 and October 2014, Dr. Gholam characterized her liver condition as in "remission." (Tr. 711, 719.)  In December 2014, Dr. Gholam indicated Truly's "numbers have finally begun to trend towards normalization."  (Tr. 685.)  In February 2015, Truly was in "complete biochemical remission."  (Tr. 683.)  In February 2016, after she had returned to work, Dr. Gholam indicated Truly was in biochemical remission, and "continues to feel better and lose weight."  (Tr. 642.) The ALJ acknowledged this in his decision, noting

> While the fact that the record shows the claimant's[sic] has been generally
> compliant with her prescribed treatment and medications, which would
> typically generally weighs in the claimant's favor, the fact that her
> conditions has been relatively well controlled by her treatment and
> medications tends [to] support [a] finding [her] allegations [are]
> inconsistent with the medical evidence.  Specifically, since her
> hospitalization in July 2013, the medical record indicates that with
> treatment her conditions and symptoms have improved (15F/3, 9F/13, 9F/2,
> 9F/23).

(Tr. 29.)

Truly directs this Court's attention to an August 3, 2016 treatment note which indicated she was in need of a liver transplant, as she was no longer able to maintain biochemical remission.  (Doc. No. 12 at 11, citing Tr.  865.)  However, this office visit occurred after the ALJ

24

rendered his July 1, 2016 decision.  In fact, this treatment note was not available for the ALJ's

consideration, but was new evidence Truly submitted to the Appeals Council.  (Tr. 39, 859.)  The

Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the

district court's review is limited to the record available to the ALJ.  *Cline v. Comm'r of Soc. Sec.,*

96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan.

22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).

Truly argues the ALJ's discussion of the "stability" of her condition is "not an

acceptable basis for rejecting the degree of severity of the symptoms" alleged.  (Doc. No. 12 at

12.)  As noted *supra*, the bulk of the diagnostic testing indicated her liver disease remained stable

during the relevant period.  Truly argues this stability "does not negate the seriousness" of her

condition, and should not be used to infer she is "symptom free."  (*Id*.)  However, the ALJ did

not determine Truly was "symptom free."  Rather, the ALJ expressly acknowledged objective

findings indicating Truly had some degree of limitation.  He noted her abdominal tenderness,

joint tenderness, and consistent reports of abdominal pain, as well as her hospitalizations,

gallbladder removal, and autoimmune hepatitis.  (Tr. 27-28.)  In formulating Truly's RFC, the

ALJ accommodated Truly's various limitations by restricting her to light work, and imposing

multiple postural and environmental restrictions.  (Tr. 25-26.)

Truly also objects to the ALJ's discussion of the treatment records which noted she had

a normal or unremarkable gait.  (Doc. No. 12 at 12.)  She argues these findings "have little to do

with the measure of severity of [her] condition."  (*Id*.)  The Court disagrees.  At the hearing,

Truly testified she could only walk for two hours a day, secondary to joint pain.  (Tr. 51.)  In the

treatment records, she described generalized joint pain, which was impacting her ability to walk.

(Tr. 528.)  Therefore, Truly's gait was relevant to evaluation of her allegations.  In the decision, the ALJ noted numerous physical examinations indicated a normal gait, "despite her alleged limitations to her ability to even perform a minimal amount of walking."  (Tr. 28.)  A review of the treatment notes confirms her treating physicians repeatedly noted a normal gait.  (Tr. 717, 706, 688, 682, 666.)

Finally, Truly argues the ALJ's evaluation of her activities of daily living was deficient. (Doc. No. 12 at 12.)  She cites to several portions of the record where she reported great difficulty performing activities of daily living.  (*Id.*)  However, the ALJ also provided a discussion of Truly's activities of daily living, noting she could drive, perform housework, and prepare meals.  (Tr. 23, 29.)  A review of the record indicates in August 2013, Truly reported difficulty with activities of daily living, and an inability to drive due to medication side effects. (Tr. 283.)  However, in September 2013, Truly reported she "drives her own vehicle to get about" and "is involved with meal preparation and laundry as well as cleaning."  (Tr. 485.) While Truly urges the Court to reject the ALJ's analysis of her activities of daily living, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. Apr. 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 807 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")

In sum, the ALJ considered a number of factors in assessing Truly's credibility,

26

including her diagnostic testing, the effectiveness of her treatment, the objective findings upon

examination, and her daily activities.  These factors are supported by the evidence in the record

and are sufficiently specific to make the basis of the ALJ's credibility analysis clear.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility

assessment.  This assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

_s/Jonathan D. Greenberg_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 15, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**